Producers of Renewables United for Integrity, Truth, and Transparency Petitioner v. Environmental Protection Agency Mr. Hughes for the petitioner, Mr. Durkee for the respondent, and Mr. Morris for the intervenors Good morning, Your Honors. My name is Jerry Mize and I am representing the petitioner in this case, Producers United. This case involves a challenge on behalf of Producers United to certain EPA actions in administering the Clean Air Act's Renewable Fuel Standards Program and, more specifically, its decision to fundamentally alter how EPA manages the Renewable Fuel Standards small refinery exemption. Recently, the public has become aware that EPA has dramatically changed the manner in which it grants these small refinery exemptions and greatly expanded the scope and applicability of that exemption. The consequence of that decision by EPA is that it has rendered significant adverse impacts on the biofuels industry as a whole, creating volatility in the market, undermining certainty that Congress intended to create when it set in place this program, and generally rendering a state of reduced demand and uncertainty in the market. The petitioner makes three challenges. Are you in the right court to bring the challenge to the remand decisions? Why isn't this more properly heard in the Tenth Circuit? So, Your Honor, let me move on to venue, if you would like. This case involves EPA's disposition of what are called RINs, which are credits under the Renewable Fuel Standards, and they are the vehicle by which EPA manages the Renewable Fuel Standards Program, creates obligated parties' obligations, allocates their responsibilities, and ensures distribution on a national basis. And the circumstances of the RINs here were very particular, right? You have a very unusual set of facts where the RINs had been retired during the course of the litigation, and EPA, faced with a novel challenge, how to make the petitioners whole here, not the petitioners, the interveners, how to make them whole here in the face of a mistaken decision not to grant them the exemption. Why isn't this just about these refineries and their very particular circumstances? Why isn't this an example of what's locally or regionally applicable and, therefore, doesn't belong in an easy circuit? Your Honor, the circumstances surrounding the specific refineries at issue, the three Wyoming refineries, came to light in June of 1918, not through EPA, because EPA treats all these renewable fuel exemptions as confidential, secret, subject to the CPI requirements of EPA's internal regulatory program. And accordingly, it was not until this particular instance involving the Wyoming refineries that the public, including our client, became aware that EPA in fact … My question isn't about the timeliness of the challenge to the remand decisions. It's about the appropriate venue. And you'll agree, don't you, that you have to show that there's a national valence to this dispute to have it here in the D.C. Circuit. Absolutely. Because if it's local or regional, it belongs in the Tent Circuit. And my question is, why isn't this the very example of local or regional … So, in our pleadings, Your Honor, the point we made was that our client was not challenging the actual granting of the exemption itself, but rather this broader policy that EPA had begun to employ to separate RINs … Had they done that elsewhere? I beg your pardon? Had they done that elsewhere? You said it's a broader policy. I mean, in this case, they had replacement RINs, right? Had they done that elsewhere? EPA has said over the course of the last seven or eight years that it reserves the right to issue replacement RINs under certain circumstances. But the specific circumstances have never been revealed because EPA, up through this date, has always treated these as confidential business information. And therefore, a party wishing to challenge that decision had no basis on which to determine what the proper venue would be, where the case should be brought. Mr. Mize, you say that EPA has reserved the authority to issue replacement RINs. And I just want to be more precise about it. They're really two different things, as I understand it, that EPA is doing. In some cases, it unretires RINs … That's correct, Your Honor. … in situations where the exemption is granted after a compliance deadline. Exactly. Here, it was a little bit different. It wasn't just unretiring RINs that still had some useful life on them, if you will, but replacing RINs that were long since expired. Expired. Are you aware of any statements that EPA has made reserving the right to do that and or any other situation in which EPA has done that? Replaced RINs that were … corresponded to RINs that were retired. Because the … I'm sorry, that were expired. Understood. Because EPA treats these transactions, these adjudications, as confidential, one would never know whether expired RINs had been replaced, whether retired RINs had been replaced. That information is held close by the agency, and accordingly, one would not know based on the record. So I understand. I understand that that puts you and the public in a very difficult position in terms of getting the information. So your answer to whether you're aware of the agency having done this with a replacement rather than just unretirement is you're not aware, but you're not willing to say it hasn't happened? I will say that in a recent, I believe it was a preamble to a recent proposed rulemaking, EPA did go on record finally and affirmatively state that it was its policy to retire, to replace retired RINs as part of its remedies in addressing these small refinery exemption adjudications. And what are you referring to there? And I'm referring to the E15 proposed rule slash preamble that just very recently was published in the last, I believe in the last several weeks. So you would petition for review of that policy? I beg your pardon? So you could then petition for review of that policy after participating in the rulemaking? That's correct. So how are you being, did they say they've been doing that in the past? So reaching back as far as 2010, which was when the first small refinery exemption rulemaking was promulgated, EPA in each and every preamble that followed that basically said we reserve the right, we may in appropriate circumstances choose to replace expired or retired RINs. But there was never any specificity revealed in terms of under what circumstances it would choose to do so. So you understood the, even back in 2010, that they were announcing that they had the authority to do exactly what they did in these five cases? Well, I would say they stated that they may exercise that authority. Of course, in our pleading, we contest that EPA ever, even reaching back in time, had the authority to. That's a different question. If they announced it in 2010, and you agree that that's what they announced in 2010. And I hadn't realized that you agreed all the way through the replacement of the RINs. But if you agree that they said that in 2010, then isn't 2010 the time to appeal? Your Honor, to be clear, I believe in 2010 what the position that EPA articulated was that it reserved the right to receive and grant small refinery exemption petitions after. Okay. The compliant state. So you're not saying that it's the same as reinvigorating RINs? That's correct, Your Honor. So that means you don't have a statement of policy in the past. It seems like you're in betwixt and between here. Either they announced a policy in 2010, in which case it's late, or they didn't announce a policy, and they never have, except in these five cases, as far as you know. Your Honor, I understand it to be the latter. Okay. Sorry. The organization or the working group that you represent. Yes. Is there any law that you can refer us to that gives it the capacity to sue? I gather this is an issue that would be, in this case, governed by D.C. law. And I'm just not – I didn't see anything about a working group having the authority to represent its members. Whether a quote-unquote working group has authority to sue? Is that your question? Yes. It's an unincorporated association in the sense that the parties have come together and formalized an arrangement, pursuing which they have agreed to proceed jointly for purposes of challenging this particular set of decisions by EPA. And are the members voting members, or what's the organizational structure? There is a joint defense agreement, which I cannot speak to the specificity of as I stand here today. Are there other activities that they engage in, or is this suit the flagship activity of this group? The group has intervened in other similar proceedings raising these very same issues and has also filed comments before the agency and engaged in other collaborative efforts geared, focused on this specific issue posed by this case. You referred in your briefing to EPA publishing on its website relatively recently information about the actual number of small refineries and the volumes of the exemptions that were being granted on a case-by-case basis after the blanket exemptions expired. And I think you referred to a September 2018. Might have been November. Is that the earliest or the first time that you're aware that that information was made public on the website? That's correct. This was part of EPA's initiative in response to efforts by our clients and others to try and introduce some level of transparency into EPA's process of receiving and granting small refinery exemption petitions. And you're not disputing the EPA's position that extending an exemption can mean just making one available? You're not arguing that only small refiners that qualified for the exemption in the early days can qualify for an extension? You make several references in your brief that sound like they're raising that issue, but I don't take you to be challenging that here. So, Your Honor, initially EPA's position was that, and this is revealed in the, not only the small refinery exemption regulation, but also the associated preamble and other statements made by EPA, that... I'm sorry. Would you mind? I just lost my... You were referring several times in your brief to, but it seemed more in passing, to the notion that an extension by its... Oh, yes. Would extend something that's preexisting. So, just to cut through it, EPA has, over the years, changed its policy, its interpretation, its construction of what extension means in this context three times. Initially, at the outset, the notion was that you had to already have been granted an extension. I mean, excuse me, an exemption. And in order to be eligible for an extension, you already had to have qualified for an exemption. EPA later changed that position to say that the party could reach back all the way to, I believe it's 2011, which is when these exemptions were first granted, and that even if there wasn't a continuity of a party holding an exemption during that entire period of time, it could reach all the way back to 2011 when those first set of exemptions were granted, and that would constitute an extension of the exemption. So, there did not have to be continuity. You could have satisfied the requirements in one year and then come back the following year. And as an extension, reapply and perhaps be granted. Are you talking about the 2014 position? In 2014, when the case-by-case exemption approach was first framed up after the blanket extension and the blanket extension? Yes, and the regulation was amended, yes. So, when they first started doing it on a case-by-case basis, there was a question whether if you qualified under the blanket exemption at all, which didn't require a year-by-year showing of qualification. It just required a showing of qualification in 2006 at the outset. Would you have to make a greater showing to get an exemption? Would you have to show that you, in fact, met the independent criteria of a small refiner for every year under the blanket period? And they said, actually, comments showed us that we shouldn't need to do that, that as long as you were in that group, you didn't have to make the additional case-by-case. And then now the position, as you understand it, is? Basically, the language in the statute, which refers to at any time, EPA is now construing to mean forget extension, forget the niceties. No prior qualification needed whatsoever. That's my understanding. Thank you. Okay. Thank you very much. Thank you. We'll hear from the EPA. Good morning, and may I please report. My name is Dan Durkee from the U.S. Department of Justice, representing EPA. With me at the council table, I have Samara Spence, also from the U.S. Department of Justice, Susan Staley from the U.S. EPA's Office of General Counsel, and representing interviewers, Mr. Ryan Morris. Your Honor, there's basically two different cases going on in this petition. One tries to reopen several old rules, and one deals with a specific grant of replacement RINs. And counsel for petitioner started out with the second part, so let me start with that. He said that there's been a dramatic increase in how these exemptions have been granted, and we got into what happened in the 2010 rule and whether they knew about what was going on and what he conceded and what he didn't concede. All those arguments we assert the court lacks jurisdiction on, because the old rules, the case law is very clear, that challenges must be based solely on grounds arising after the period for initial judicial review, and what counsel is describing both here and in this brief do not qualify. For instance, in 2010, EPA did say that these exemptions would be granted even after a standard had been set. And EPA repeated that in numerous subsequent rulemakings, and we have the JA sites in our brief. That is not new information. To the extent counsel says that those numbers have increased over time, that is not the kind of new information that would justify reopening challenges to the rules. That is implementation of something that they knew about, they could have challenged at the time, they should have challenged at the time. Mr. Turkey, has EPA ever said in the Federal Register that it interprets extension to mean make available? I am not sure about that, Your Honor. That argument that you were asking about with Fisher counsel also, that argument I think is more clearly raised in the AFPM case, which I believe you're on the panel for, and I think that that is, I think your question was well put to counsel, that's not clearly raised in this case. They do kind of mention it, but their argument is not that these exemptions were improperly granted because they were not an extension of a prior exemption, that they were a new exemption. And, in fact, that's not the case. So that argument isn't presented here at all. You said, in fact, it's not the case that they're new? I believe that's right. These exemptions, the five exemptions at issue were, I believe they were extensions. Do we know that? I mean, there's a difficulty here of the lack of public access to the information. We don't actually know. There's nothing in the record that says that. Nothing in the record that says that. There's nothing in the record. The record, and part of the record is sealed, so that's a challenge about talking about it, but the record describes the timing of granting these, which is another basis on which counsel says this is new information, that these exemptions are now being granted well after the compliance period has ended. These exemptions were not. And the chronology is in the record that these exemptions were sought timely, EPA acted on them timely in the sense that it was before the compliance period, deadline had been reached, and then the delay comes in when that denial was challenged in the 10th Circuit. I have a more general question, which is, you know, there's back and forth about whether if this is an after arising challenge, it's timely, and going to the question of when the petitioners had notice of what they claimed to be a change in the legal position of the agency. Is a news article enough to give notice that would trigger the time for purpose, the running of the time for purposes of an after arising challenge? And if so, is there any authority that you can point us to to that effect? I'm not aware of any authority. I know that interveners raise the timeliness. We don't challenge the timeliness of the part of the case that deals with challenging the RIN replacement. Right. I'm talking about the other part where they're saying the volumes are being undermined by the EPA's policy about the circumstances under which it will grant an exemption. And there's a lot of uncertainty about the terrain. But I'm just curious about your position about what constitutes notice. So, you know, just so we have some kind of a baseline. Your Honor, I don't think we've taken a position on what constitutes sufficient notice of an after arising ground. What we've said in this case is to the extent the court can divine from petitioners' brief and statements, what they point to as those grounds, we're assuming that they knew about. We're not saying they didn't know about them in a timely way. We're saying that doesn't matter because they don't constitute after arising at all. You're saying it doesn't change anything. It doesn't change anything, that's right. And also, by the way, to your prior question about whether these grants were an extension, whether there was a lapse, I actually should defer to Counselor Bernard-Ruiz because if he knows, he probably knows better than I. Because as I think about it, like I said, it's not in the record. I really shouldn't say one way or the other. So to the extent that's relevant. You're talking about the five? The five. Yeah, whether those five were actually extensions of prior exemptions or whether that period of lapse and they were new. Is that not reflected in the sealed record? That is not reflected in the sealed record. And the opinions don't state what their extensions are? I don't believe they are. I believe the opinion says when the facility applied, when EPA denied, and then the subsequent litigation history. They're all basically the same. So the first one's at J.A. I have J.A. 906. Yeah. Frankly, I don't see anything confidential about this. It says applying for a one-year extension. What does that mean? Well, I don't know if that meant that they were asserting that it was an extension or that it actually, in the sense that the statute uses this term, it's an extension. Does the 10th Circuit's opinion describe it? I would have to look back at that. I don't know, Your Honor. Can I ask you about the RINs just for one second? I will say their argument about this isn't exactly clear, but to the extent they're making an argument that the reinstatement of the RINs is a national policy, they were unable to describe any statement of a policy about reinstatement of the RINs. Is there any statement other than in these individual adjudications to the extent that it's in the individual adjudications? Well, sir, let me try and narrow the question to make sure I'm answering correctly. I'm only talking about the response to the 10th Circuit's, that is, reinstatement of RINs after they've expired. Right. That is not, the only time that's ever happened, to answer a question earlier, this is the only time that's ever happened. It has not happened before or since. Ah. The only time that. Only in these five cases. Only these five cases. Now, the broader question that the Court was asking about, has EPA ever retired a RIN when a small refinery has already retired them to comply? It turns out they get the exemption. Yes, that's happened. And that is not new here. But the narrower question, has EPA ever actually taken the second step in saying, well, in these facts, we're going to give you replacement RINs because there's a problem. This is the only time it had happened to date, and it has not happened since. And EPA. And when did EPA first declare its authority to use replacement RINs in the fashion that they are doing so here? In these decisions. This is the first and only time that EPA has done it. And EPA took pains to try to explain why it was fact-specific to this case. It's not just that these RINs have been retired, and now this small. And that doesn't represent a change in policy? Well, that by itself is new. It had never happened before. But, and we're not disputing that they could challenge that in the right venue, which we think is not here, obviously. But we're not saying they can't challenge that. Why isn't the appropriate venue here if it's EPA announcing a new policy that's happening, they're happening to, they're enforcing it here in the Tenth Circuit cases, but they've clearly allowed for the possibility that they may enforce it elsewhere. That's something new. It has nationwide application. Why not bring it here? So I disagree with several of those parts of that response. It is new. And if that were the only thing they pointed to, they could say that's new grounds to try and reopen an old rule. The fact that it's new or not goes to jurisdiction over old rules. Now, we say the fact that this one element is something that's new, this one element being we're going to give you replacement RINs, that's new. That is not new grounds to reopen 2010, 2012, 2014. That's actually not my, I mean, I'm interested in that, but that's not what I was trying to get at. Right. The venue question. The venue question, right. So there are distinct parts of the case. So the fact that it's new is relevant, let's say is relevant to both parts. We say the fact that it's new, if anything, should be considered in whether it's grounds arising solely after. Under venue, the test is different. Under venue, this is not, they did not announce a policy in the sense that they're saying going for, in the sense that they're saying this is. Not expressly, but by implication, haven't they? No, I disagree because it's fact specific, which is expected in an adjudication as opposed to a rulemaking. This was. But isn't the argument that they've said in fact specific circumstances, we're going to do something that we've never done before, and that's use replacement RINs. We've done it here. So are you saying that they're never going to do it again? I can't say they're never going to do it again. No, because they've established that they can do it, and maybe this is the first instance of it, but that's now on the table for their, in terms of the tools that they use to create remedies. EPA has now announced this is a remedy that we can use. Why isn't that appropriately brought here? Because it has nationwide scope. Because that's not the test under the venue statute. What's the test? The venue statute is nationwide applicability. Right. Or if it's local or regional applicability, nationwide effects, and EPA makes a finding and publishes it. And what they're trying to do is say there's nationwide effects, and the court should make the decision that there's nationwide effect, not EPA. I thought they were saying nationally applicable, and there is some logic to that because the market is a national market, and if you had, let's say you had the Tenth Circuit creating precedent that said replacement rims, and you had another circuit, the Ninth, saying only if the small refiner had sought to stay its compliance obligation while it litigated, whether it was wrongly denied an extension of its exemption, and that's the way to remedy this kind of situation. Or give it a break on its future compliance obligation, but don't un-retire or don't revive rims that have expired. You could end up with not only a circuit conflict, but with a sense that rims in different, you know, coming out of different jurisdictions were at risk in different ways. I mean, why doesn't the nature of the program make that a question of national applicability? Well, two responses. One, the nature of the program is an effect. It's not the applicability of the challenge decision. The challenge decision is that these five refineries get a certain type of relief. That is the applicability of the decision. It applies to these five refineries. That decision might have nationwide effects, but that's a different part of the statute. And the second answer is the court's case law from Dalton and other cases says that's the test. You do not look at the effect of the action. You look at the face of the action, and that's exactly what Petitioner is trying to get around. You look at the face of the action. It's these five small refineries get replacement rims and the exemption. The effect of that, maybe it's got nationwide scope. Maybe it's got broader scope. Effects, I mean, the practical effects. But that's a different part of the venue statute, and you can't conflate the two. And Dalton and the other cases say you can't. In fact, we've seen the Seventh Circuit change its mind on that. The Seventh Circuit in Madison adopted essentially the test that Petitioner is advocating. And then in southern Illinois said, no, we're going to join this circuit and other circuits and say that's not what the statute means. The statute means what's the face of the action applied to. And case after case from this court that's analyzed that has agreed that you only look to the face of the action, not its practical effects. I have a question about, so it does seem like, just judging from what the EPA has put on its website, that the approach has somewhat changed. And maybe this isn't a fair question to ask of you, given that you represent the agency. But is that subject to challenge? Will it be subject to challenge? What's the closest, like what's the right way for a participant in the industry to test the legality of the agency's treatment? And I'm not talking here about the RIN replacement or revival, but the extension, the treatment of extensions and the fact that it's a much bigger category now. Well, I can't give you a concise, clear answer because some things, they might be out of time to change. If what they're really complaining about is just a dramatic expansion of how many of these exemptions are being granted, which is how counsel started his argument, that's implementation of a program that was announced years ago. And just because they didn't challenge it at the time doesn't mean that there has to be some remedy somewhere. Well, they could challenge it and they have challenged it in the recent rulemakings, right? They have challenged. And if you come out with the same rule that you had before, they can challenge that as now arbitrary and capricious in light of the changes. I'm not saying they'd win. Right. But they can certainly challenge it then. Right. Well, yeah, there's multiple avenues depending on what EPA does, what EPA has done in past, more recent rules that are being challenged in this court, what EPA might do in another light. But depending on the nature of those rules and the nature of the challenge, I can't say, well, there's a guaranteed right of review that if they just did A, B, and C, they can challenge that decision. Because it might just be they're out of time. Maybe we're not following each other. The argument about the vast expansion, even of the thing that you announced in 2010, its application in a new rule for 2018 or a new rule for 2019 or a new rule for 2020 can be challenged. You do have to come up with a new rule. There can be a petition for review of that new rule. Right. And a classic arbitrary and capricious challenge is circumstances have changed. Right. In 2010, you thought there were only going to be three exemptions granted. And now there's 50. Times have changed, and it's arbitrary and capricious to continue the old rule. That's clearly a timely challenge for the future, not for the past. But it's a timely challenge for the future. But there's another side to that. And this has come up in this Renewable Fuel Standards Program and other contexts. And the other side of that is certainty and repose. For instance, the – That would be your defense to the argument about arbitrary and capriciousness. But it wouldn't preclude the timeliness of an argument. I'm not sure. That would be a defense. I'm not sure that that – I'm not sure that we wouldn't also have more of a jurisdictional argument that it's too late to bring that. Because if you could continually challenge the same thing over and over and over just each time it's applied, then – Well, they would only be able to do it if the facts have changed significantly enough to make it arbitrary and capricious. Right. So if they could plead the proper challenge, that could be a – And you said they've pleaded a timely challenge to the RIN replacements if we send it to the Tenth Circuit. Yes, the Tenth Circuit – So it can be challenged there. These particular ones. Well, if the Tenth Circuit were to rule that this remedy is unlawful under the statute, you would have a precedent making it unlawful. And maybe you could do it in another circuit and – or maybe the Supreme Court would take the case and resolve the matter. Exactly. But that is yet another way in which that can be done. Exactly. Yes. What's the significance of whether the producers of renewables timely challenged the – or included in their petition, their original notice, the challenge to the 2020 Renewable Fuel – I mean 2012, I'm sorry, Renewable Fuel Standard? It seems like the statements are the same as what EPA made, and you were in the brief struggling against that having been challenged. Is this just fastidious lawyering? I think part of it is we felt that in the motion practice there was a bit of a moving target about what exactly are they challenging, and it was important to be clear what exactly is at issue because, for instance, it does make a difference whether they're challenging the actual exemptions or the replacement RINs, and they have clarified that. So we wanted to be clear about which rules they say are reopened because it matters what they point to as the alleged new grounds. If you need to know what's being reopened, allegedly, or what's being new grounds, you need to know what you're aiming at to evaluate it. So part of it was just being fastidious. Part of it was it was important to understand what the context of the case is. Let me ask you, zooming out a very much more big-picture question, which is what is the need for and purpose of the small refinery exemption? Why is it, given that a lot of these small refineries are actually owned by larger companies and we're just talking about something that you have to do some bookkeeping about and pay some money on, what is it? What's going on on the ground? That's something that my colleague that represents small refineries could probably answer better, but I think the broad-brush answer is Congress made that determination that there could be hardship, there could be a disproportionate impact on small refineries that makes it hard for them to comply with this program and gave them an offering. But you can't add anything more representing the agency that administers the program. It seemed like it was maybe to get sort of bookkeeping and administrative approaches up to speed because there's a lot of statements both in the record about small refineries having a waning need for this and they would have to report when they'd be ready to not have the exemption. It was this idea that this was a transition rule. Well, so the way it's applied now, EPA does ask for a body of information from refineries that are seeking the exemption. The first three quarters of the year, their financials to demonstrate the harm that they're alleging. What is it that's so burdensome? To comply with, to buy the rooms? Yeah. Well, again, I'm not well positioned to say that. My guess is it's probably a combination of transaction costs and actual economic costs of purchasing the rooms. But I would really defer to the actual small refiners to better articulate both the purpose of the program and why it's important to them. And confidentiality. Presumably these are companies that have to make reports about their financials? I don't know. Right. What's the need for such confidentiality about which small refiners are getting these and if there's not some basic information that the public could have to monitor or be aware of what's happening? The way that EPA's regulations on how to treat confidential business information and the way those regulations work is if somebody submits information that the submitter claims as CBI, confidential business information, EPA treats it as CBI until EPA can go through a process to determine whether it is or not. And so that's why when you look at the redacted portions, there's these big blocks of redacted information that maybe not all that's really CBI once EPA has a chance to look at it. But because the claim was made, EPA treats the whole thing as CBI and then at some future point would look at it and say, well, that's actually just this paragraph. But they didn't get to that point before this litigation got to this stage. So I think the answer to your question is it's CBI because the submitter claimed it. They're claiming it. They claimed it, right. And we haven't gotten to the point where EPA would make an actual decision, yes, that is, or no, that's not. So we treat it all as CBI. Okay. We'll hear from the intervener. Thank you. May it please the Court. Ryan Morris for interveners. As has happened thus far, I think it's critical in order to really understand what's going on in the case to really identify what the final agency action issue is before you can take any further steps. If what they are challenging is a policy, some broader policy, as has been started thus far, they haven't identified final agency action for a broader policy of an increased rent amount or anything along those lines. And as the Court said in Fund for Animals, you don't identify or the Court doesn't address policy changes in the abstract. You need something tangible in order to look at. So with regard to that, they haven't identified it. It's not in their petition. It hasn't arisen anywhere in the briefs as to what that policy is in a final agency action. And I think on that basis alone, you can set the policy aside. There's no jurisdiction in order to review it. With regard to the individual exemption orders at issue, as we've stated, there are other reasons why those don't belong in this Court. First, we'd say there's no standing. They haven't shown or connected with evidence a concrete injury traceable to these orders for any of the members at issue. So you think you should put your time into the same arguments that were made by the DOJ with respect to jurisdiction and venue. Fair enough. With respect to venue, Dalton is very clear that there are only two ways in which venue is proper in this Court. Either on the face of the final agency action, there is something that says it's nationally applicable. Nothing in these is nationally applicable. It is only between the parties at issue. The remedy is only for a particular party from EPA. So it's not within the nationally applicable on its face category. The second category is that there is an actual expressed finding from EPA that is published that says they're a nationwide scope and effect. We don't have that either. So for venue purposes, these orders belong in the Tenth Circuit, if anywhere. What about the treatment of exemptions? First of all, I'd like to hear from you. What is the animating concern for these exemptions and why the confidentiality? Why the full scope of confidentiality claims? The animating concern for these is in the fuel market, you've got a variety of different kinds of entities competing against each other for the same fuel. Some are rather integrated and they can blend. So if you go down the process in terms of how you produce the fuel, but then the reins aren't separated and compliance in the RFS doesn't happen until there's actually the blending of the renewable fuel with gasoline or the diesel, as it were. A lot of facilities, a lot of small refineries don't have that blending capability. They just can't blend as much fuel as they're producing. But that's a separate question, and it's been much mooted in other cases. The identification of the obligated parties and the blenders aren't the obligated parties, right? The refiners and importers are the obligated parties. Correct. And so there are bigger refiners, smaller refiners. Both of them are in a position of having to account for, having to have these credits for the fossil fuels that they're selling. And if it's just a matter of buying something, passing the cost onto the consumer, recouping it from someone who buys the rent back. I just don't see why the differential, small refiners versus medium refiners versus big refiners. Right. And that presupposes that the cost just passes straight on through. There are a lot of studies and other things, obviously, beyond this, that it's not passed straight on through. There's been fights with Congress, DOE, and others about what the actual economic harm is to the small refineries. And they are bearing a certain cost, and we think it's a considerable one, especially when they can only service certain markets. A lot of small refineries are far off. It takes a while to get the fuel out, and so they have a lot of things, and they suffer from very tight margins. So it's hard for them to be profitable, but they do have markets that they need to service. Therefore, this type of exemption is really necessary for a lot of them in order to carry on, service their markets, and compete with the much larger and more integrated facilities that can easily blend, have excess RINs, and carry on with really no impact whatsoever from the program. And why confidentiality? Would it be a problem for the participating refiners if their identity and the scope of the extension granted were public? Depending on the service. Because these really do matter for some small refineries, and some of them are public, what gets published or not published may be. But a lot of the confidential information, a lot of the information that they have to submit to EPA as part of the DOE analysis and figure out whether or not it's very sensitive. That has to do with economic hardship. I understand that, internal financial viability of the firm. Right. But what about the results of these decisions which have been not made public? I gather there is this one inventory on the EPA's site about the actual number and volume of the exemptions. Am I right that that was a September 2018 list? That they put out? Yeah. And they had the similar information that went in the letters to Congress as well. And is that the earliest that we know of being on the website? That's the earliest I'm aware of. Okay, and then the letter responding to Grassley's inquiry? My understanding is there is an ongoing rulemaking with regard to what information is public or not public. Why can't they just file a FOIA request? My understanding is that FOIA would keep some of that information. Some, but it wouldn't. If the question is do we know how many exemptions the agency is granting, a FOIA request for a sentence that says granted on every order over the last 10 years, I can imagine that at least that element would have to be redacted from a FOIA request. Can you? No. Yeah. I see no hands up. Unless there are any further questions? No. Thank you. I assume there's no time. All right. We are about 10, a little bit more than 10 minutes over. We'll give you another three minutes. Can I ask you one question? There's a petition for review in this court filed in the advanced biofuels case. That's 18-1115. It was filed May 1st, 2018. Are you familiar with that? I'm familiar with it, Your Honor. You are. So in that case, it refers to the complaining about the agency's retroactive grant of a historically unparalleled number of exemptions has destabilized the national renewable fuels market, refers to Senator Grassley's letter. That's the same kind of argument you're making here. So in that proceeding, what is being challenged is the criteria by which EPA determines whether to receive and grant a small refinery exemption. Is the challenge to the kind of decision the Tenth Circuit made? Is that what you're saying, the standards? That's correct. I'm sorry. It's the word retroactive in the sentence. So is not part of what you're arguing here also being argued there? What we are arguing is that the Tenth Circuit never addressed in its decision anything about rinse, what the remedy should be. I understand you're not challenging the standard by which a decision is made. That's correct. I understand that. But you're challenging the retroactive application of that standard in an exemption today granted for the past. Is that wrong? The standard in the underlying proceeding? I thought you were challenging here the notion that at any time, those quotes around the statutory phrase. Yes, Your Honor. Right? Yes. It can be granted for the past. That's correct. I understood the meaning of the word retroactive. That's correct. So doesn't this suggest that, I'm trying to get my head around this question of when you knew. So that's filed May 1st, 2018. So is it the case that by May 1st, 2018, it was already known that they were granting historically unparalleled numbers of exemptions retroactively? I believe it was May 31st. I'm sorry, Your Honor. That's on moment. That case was filed May 1st, 2018. I beg your pardon? It was filed May 1st. I have it in front of me. I'm sorry. I apologize for that. My understanding is that in the ABFA proceeding, they are not challenging the timing. It's a different question. The standard. I understand. No, I understand what they're challenging, but they knew about the retroactivity by that stage. The question of whether it's a grounds arising. I understand. Right? So it has to be within 60 days of the grounds arising, right? Correct. And it sounds like they knew by no later than May 1st that there was a ground arising. With respect to the RINs, the very first time that the public became aware that EPA was unretiring expired RINs was in this article. I understand. I want to separate out the RIN part from your other arguments. You certainly have a set of RIN arguments. I want to separate that out just for the moment. All the other arguments in the case, the arguments about at any time, about the retroactive application, about not renewing volume that had been taken, that was all known. And to the extent there was a sea change in that respect, that was known by May 1st, 2018, because a closely related party was bringing the same case. Because the language that was at issue essentially reserved EPA. EPA basically used the language, we may. No, no, I understand that's why you didn't think that what happened in 2010 is relevant. But here you're talking about the facts that you're concerned about, the huge number, the unparalleled number. And in this filing, it's responding to the agency's retroactive grant of historically unparalleled number of exemptions that have destabilized the national renewable fuels market. Yes. So what you're saying, I understand, Your Honor. I'm not saying, I'm just asking why this doesn't. Why they're not interrelated, is that your question? Why this isn't an indication that the grounds arising subsequent to the rulemaking had already arisen by May 1st. That's my question. Well, we've tried to focus the grounds arising on the specific issue of whether or not EPA was entertaining requests by regulated parties to regenerate rent. Replace rent. That we did not know from anything that was in. Right. And they basically conceded that. Do you have any broader challenge before us? It sounds like maybe you don't, that that is the gravamen of your challenge. You're not challenging. In terms of the grounds arising after? In terms of anything in your petition. Let me mention just a couple very quickly. Number one, following the Holly Frontier and the Sinclair decisions in the Tenth Circuit, there's now a proceeding pending in the Fourth Circuit, Ergon, and one pending in the Ninth Circuit, Kern Oil, where the same relief is being sought. So the very hypothetical that you posed, Judge Blart, is indeed presenting itself. Number two, Your Honor, I believe you asked whether EPA had ever taken a position that it intended to going forward. As a policy, unretired RINs as part of its remedy in the small refinery exemption cases. And in its recent promulgation regarding the E15 proposal, EPA flatly stated that it intended to unretire RINs, but it declined to take comment on that particular prosecution. Is that in the record, what you just cited? Your Honor, it was subsequent to the briefing. So we don't have that. That's correct. And I assume you could challenge that. That's correct. Your Honor, let me just say one more thing, which is that also the issue also arose in the context of the challenge to the 2019 RFS standards. And in that particular proceeding, EPA took the position that this issue of whether it had authority to unretire RINs was outside the scope of that particular proposal, and it declined to accept comment on that specific issue. Lastly, Your Honor, you asked about the CBI issue and why couldn't a party simply file FOIA requests. FOIA requests have been filed over the years and uniformly on this issue been flatly declined. That's what we're here for. Thank you. Did you bring a – have you brought one in the – have you appealed? Have you filed a FOIA case? Two FOIA requests. Have you filed a FOIA case in the district court? That would seem like the logical place to go if they deny your FOIA request. Understood. At least the intervener thinks you might have a good case, at least from the bottom line of every one of those decisions. Thank you, Your Honor. All right. We'll take the matter under submission. Thank you all. We'll also take a brief break.
judges: Garland, Griffith, Pillard